# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| ERIC S. TESLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-00640-TWP-MPB |
| | ) |
| MILLER/HOWARD INVESTMENTS, INC., a | ) |
| Delaware Corporation, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Miller/Howard Investment Inc.'s ("Miller/Howard") Motion for Summary Judgment. ([Filing No. 84](#).) Plaintiff Eric S. Tesler ("Tesler"), a former employee of Miller/Howard, raises multiple claims against Miller/Howard concerning unpaid compensation. ([Filing No. 35](#).) Specifically, Tesler is asserting claims of unjust enrichment (Count III), negligence (Count V), breach of fiduciary duty (Count VI), and breach of contract (Count VIII). For the following reasons, the Court **grants in part and denies in part** the Motion for Summary Judgment.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Tesler as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Miller/Howard is a financial management corporation that sells securities. It hired Tesler in October 2010 as a Regional Sales Director to perform sales duties from his home in Fishers, Indiana. Tesler's job was to market Miller/Howard's financial services to investment advisors in

his assigned region, the "Middle United States," and hopefully induce them to patronize Miller/Howard instead of another financial services company. Tesler did not provide investment management services; rather, he sold the investment management services that other Miller/Howard employees provided. He reported to Steve Chun ("Chun"), Miller/Howard's Director of Marketing. ([Filing No. 85-1 at 3](Filing No. 85-1 at 3).)

Prior to hiring Tesler, Miller/Howard recruited him. During this recruitment process, Tesler spoke with Chun both over the telephone and at Miller/Howard's corporate headquarters in Woodstock, New York. He also spoke to Tracee Cannon-Gordon ("Cannon-Gordon"), a recruiter employed by a recruiting firm that Miller/Howard had hired to assist in filling the Regional Sales Director position. *Id.* The parties dispute whether Cannon-Gordon was an agent of Miller/Howard and whether she was empowered to negotiate employment terms with Tesler on Miller/Howard's behalf. ([Filing No. 85 at 3](Filing No. 85 at 3); [Filing No. 93 at 2-3](Filing No. 93 at 2-3).)

Tesler discussed compensation with Chun in anticipation of being hired at Miller/Howard. ([Filing No. 85-2 at 11](Filing No. 85-2 at 11).) Chun told Tesler that, for accounts he generated, he would receive a "25 percent commission the first year the account is opened, 10 percent in the second year, and 5 percent in the third year, and 3 percent perpetuity." *Id.* When asked whether Chun used the word "perpetuity," Tesler testified "I believe his words were 'ongoing,' but he also referenced, when I asked him what, you know, 'ongoing' meant, if I recall correctly, he used the words 'perpetuity,' which also appears in their documentation." *Id.* Tesler also discussed compensation with Cannon-Gordon, who quoted the same commission structure as Chun, but specifically explained that Tesler would continue to receive the 3% commission on accounts he originated even after he left the firm's employ. *Id.* at 14.

On October 27, 2010, Tesler accepted Miller/Howard's offer of employment as a Regional Sales Director. ([Filing No. 85-1 at 2](#).) When he was hired, he signed three relevant documents. First, on October 27, 2010, both Tesler and Chun signed a document titled "Terms of employment and compensation." *Id.* at 9. That document laid out the compensation structure Tesler would receive at Miller/Howard, which included a "$75,000 base salary" and a "commission schedule for [separately managed] accounts-25%-10%-5%-3% ongoing," enacting the discussions Tesler had with Chun and Cannon-Gordon prior to his hiring. *Id.* Tesler would also receive a 15%-10%-5% commission schedule for institutional accounts ("UMA") and a "3% ongoing trail for current accounts—to service existing business in territory." *Id.*

Both parties designated Miller/Howard's employee handbook, titled "Employee Policies". ([Filing No. 85-1 at 14-27](#); [Filing No. 8-2](#).) The employee handbook specifies that "[t]erminated employees will be paid for vacation hours earned and not taken up to the point of termination. Sick hours earned and not taken will <u>not</u> be paid upon termination." ([Filing No. 85-1 at 19](#).) (Emphasis in original.) Tesler signed a document acknowledging he had read and understood the Employee Policies on November 5, 2010. *Id.* at 57. That acknowledgment form stated,

> I understand that the contents of the policies are presented as a matter of information only and are not to be construed as a contract between the Company and any of its employees…. I further understand that my employment is not for a specified term and that it may be terminated with or without cause at the will of either the Company or myself.

*Id.*

The third document Tesler signed upon his employment with Miller/Howard was called "CONFIDENTIALITY AGREEMENT." *Id.* at 54-55. By that agreement, also signed on November 5, 2010, Tesler agreed to keep Miller/Howard's proprietary information confidential, including investment techniques and strategies and information pertaining to principals and

3

investors. *Id.* The agreement prohibited Tesler from "tak[ing] possession outside of the office or on electronic media any documents, formulas, notes, files, client or contact lists, or work product of the employer, notwithstanding that he employee may have participated in the creation of such work product." *Id.*

On November 5, 2010, Tesler signed a document certifying that he had read and understood Miller/Howards' Code of Ethics. *Id.* at 49. Tesler certified in that document that he would comply with the "Code of Ethics" as well as "Miller/Howard Investments' Insider Trading Policy" and its "Personal Emails Policy." *Id.* Neither party designated the Miller/Howard's Code of Ethics or the Insider Trading Policy or Personal Emails Policy, and thus those documents are not part of the record of this case.

During Tesler's employment with Miller/Howard, he opened numerous separately-managed accounts ("SMA") and managed numerous UMA accounts, yielding management fees for Miller/Howard. Miller/Howard paid commissions as a percentage of the management fee collected for an account. When a customer opened an account for management at Miller/Howard, the company would assess a management fee against the account on a quarterly basis. Regional Sales Directors earned a commission based on a percentage of that management fee. For example, if an SMA was opened, the Regional Sales Director would receive a quarterly commission in the amount of 25% of the management fee paid on that account each quarter (with the exception of the quarter in which the account was opened). This 25% commission would continue each quarter for the first year the account was opened and then decrease from there according to the commission schedule.

Miller/Howard asserts it paid the quarterly commissions to Regional Sales Directors during the calendar quarter for which they were due. ([Filing No. 85-1 at 4](Filing No. 85-1 at 4).) For example, Tesler was

4

paid $27,900.84 commission on February 7, 2014. *Id.* at 12. That commission was based on the management fees assessed against accounts in Tesler's assigned territory during January, February, and March of 2014. Tesler either did not understand this process or does not agree that commissions were paid during the calendar quarter for which they were due. He testified that "[t]he commission—the second quarter commission would be paid after they collect the management fee to—from my understanding, and so it would be after the—basically after the end of the quarter." ([Filing No. 85-2 at 20](Filing No. 85-2 at 20).)

Whether it was because he did not understand the process or for some other reason, in April 2012, Tesler became concerned that the commission amounts he was being paid were not consistent with the Terms of Compensation agreement he signed. ([Filing No. 85-3 at 4](Filing No. 85-3 at 4).) Tesler requested from Chun a detailed accounting of his "commission run" so that he could independently calculate the amount he was owed. *Id.* Neither Chun nor anyone else at Miller/Howard fulfilled that request. *Id.* Tessler contends that Miller/Howard disciplined, and ultimately terminated him because he raised questions about the proper calculation of his commission. *Id.* at 5.

Miller/Howard terminated Tesler effective March 6, 2014. On that date, Chun telephoned Tesler to inform him his employment was terminated and instructed him to return all company property by the following day. Miller/Howard sent overnight shipping supplies to Tesler so that he could return company property the following day. Following his termination, Miller/Howard continued to pay Tesler his normal salary through March 29, 2014.

More facts will follow below as necessary.

## II. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith*

5

*Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the Court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of the claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III. DISCUSSION

The following claims in Tessler's Second Amended Complaint remain pending for trial: Count III – unjust enrichment; Count V – negligence; Count VI – breach of fiduciary duty; and Count VIII - breach of contract. Miller/Howard argues it is entitled to judgment as a matter of law as to all claims. The Court will first address the claim for breach of contract.

### A. Breach of Contract (Count VIII)

Under Indiana law, the essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Miller v. Fidelity Nat'l Prop. And Cas. Ins. Co.*, 2010 WL 2773305 at *3 (S.D. Ind. July 12, 2010) (quoting *Fairfield Dev., Inc. v. Georgetown Woods Senior Apartments Ltd. P'ship*, 768 N.E.2d 463, 473 (Ind. Ct. App. 2002)). In its brief in support of the Motion for Summary Judgment, Miller/Howard focuses primarily on the first element, arguing that no contract existed between it and Tesler, and, alternatively, that any such contract did not guarantee Tesler commission payments after termination of his employment or that Tesler's breach of contract claim is barred by Indiana's statute of limitations. (Filing No. 85 at 15.)

"For an employment contract to be valid and enforceable" under Indiana law, "four elements are needed: (1) the place of employment; (2) the period of employment; (3) the nature of the services the employee is to render; (4) the compensation the employee is to receive." *Firestone v. Std. Mgmt. Corp.*, 2005 WL 1606955, at *12 (S.D. Ind. 2005) (citing *Majd Pour v. Basic Am. Med., Inc.*, 512 N.E.2d 435, 439 (Ind. Ct. App. 1987)). Under Indiana contract law, "a contract is unenforceable if it is so indefinite and vague that the material provisions cannot be ascertained." *Id.* (quoting *Ewing v. Bd. Of Trs. Of Pulaski Mem'l Hosp.*, 486 N.E.2d 1094, 1098 (Ind. Ct. App. 1985)). "The agreement must be reasonably certain in the promises and performances to be

rendered by each party and must provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* (citing *McLinden v. Coco*, 765 N.E.2d 606, 613 (Ind. App. 2002) and *Ewing*, 486 N.E.2d at 1098).

The Second Amended Complaint alleges: "The Terms of Compensation [Filing No. 85-1 at 9], and, to the extent incorporated by the Terms of Compensation, Employee Policies [Filing No. 85-1 at 14-27], are a contract between Tesler and [Miller/Howard] concerning the manner in which Tesler would be compensated for his employment." (Filing No. 35 at 14.) But in his deposition, Tesler discussed three separate documents, the Terms of Compensation, the Receipt and Acknowledgment Form of the employee policies (Filing No. 85-1 at 57), and the Confidentiality Agreement (Filing No. 85-1 at 54-55) created a contract. (Filing No. 85-2 at 20-21.) In the summary judgment briefing, both parties proceed with the understanding that the alleged contract is comprised of those three documents. (Filing No. 85 at 14; Filing No. 93 at 9.)

Miller/Howard makes three arguments as to why these three documents do not create an enforceable employment contract: (1) the Receipt and Acknowledgment Form of the Employee Policies explicitly says that it is not a contract, (2) the Terms of Compensation do not mention the place of employment, the period of employment, or the nature of services Tesler was to render—three necessary elements under Indiana law according to *Firestone*, and (3) the Terms of Compensation sheet is too vague to constitute an enforceable contract. (Filing No. 85 at 15-20.) It also argues that even if an employment contract existed, that contract "says nothing about payment of commissions following the end of Plaintiff's employment." *Id.* at 21. Miller/Howard also argues that any breach of contract claim Tesler has is barred by a two-year statute of limitations for claims related to unemployment because plaintiff because aware of his potential claim in early 2013 at the latest. *Id.* at 24-25.

8

Tesler responds that the three documents represent a meeting of the minds between the parties. (Filing No. 93 at 10.) Tesler urges the Court to ignore the language from the Receipt and Acknowledgment Form asserting that the document is not a contract: "[Miller/Howard] notes that certain Employee policies specifically disclaim that they constitute a contract and that disclaimer is contractually binding." *Id.* He argues that even if the Court finds the Employee Policies are not a contract, the Terms of Compensation is severable and stands as an enforceable contract on its own. *Id.* at 11. Last, he claims that the term "ongoing" contained in the Terms of Compensation is unambiguous or is at least a question of fact that requires a trial to define. *Id.* at 19.

1. **Terms of Compensation**

The Terms of Compensation document, styled as a memorandum from Chun to Tesler, lays out eight terms of compensation for Tesler, including a "$75,000 base salary," "commission schedule for SMA accounts- 25%-10%-5%-3% ongoing," and "commission schedule for institutional accounts – 15%-10%-5%." (Filing No. 85-1 at 9.) It also purports to entitle Tesler to "[b]enefits as outlined in [Miller/Howard's] Employee policies." *Id.* Under those eight terms of compensation are Chun and Tesler's signatures. Miller/Howard argues the document is not a contract because it does not meet the requirements of an employment contract under Indiana law and because it is too vague.

The Terms of Compensation document unquestionably does not contain the place of employment, the period of employment, or the services Tesler is expected to render—three elements necessary to a valid employment contract under Indiana law. *Firestone* at *12. Tesler argues that no "special body of law exists" in the area of employment contracts and cites *Williams v. Riverside Cmty. Corrs. Corp.*, 846 N.E.2d 738, 745 (Ind. Ct. App. 2006) for the proposition that an employment contract requires only "(1) the employer's offer to pay (2) consideration for the

Employee's services and (3) the Employee's acceptance through performance of services." (Filing No. 93 at 15-16.) Tesler's position makes sense logically, as the distinction between an *employment contract* and a mere contract is a matter of semantics. In other words, assuming, as Miller/Howard argues, that an employment contract under Indiana law requires four specific elements, would a contract with only three of those elements not qualify as an *employment contract* but nevertheless be enforceable, having satisfied the normal requirements for a contract—offer, acceptance, and consideration? Given Indiana's strong belief in its citizens' freedom to contract, the Court sees no reason why an employer should be required to spell out four specific terms any time it wants to come to an agreement with an employee, as opposed to merely contracting on the one or two terms they choose. *See BMD Contractors, Inc. v. Fidelity and Deposit Co. of Maryland*, 679 F.3d 643 (7th Cir. 2012) ("Indiana has a strong background presumption favoring freedom of contract.")

Miller/Howard makes a second attack on the Terms of Compensation document, arguing it is too vague to be an enforceable contract. "The compensation terms Plaintiff relies upon for his breach of contract claim are so indefinite and vague as to fall short of being enforceable terms of an agreement." (Filing No. 85 at 18.) For example, Miller/Howard faults the language of the Terms of Compensation for specifying a "25%-10%-5%-3% ongoing" commission schedule on SMAs without saying what time period those numbers corresponded with or how commissions would be calculated. (Filing No. 85-1 at 9.) "It is a fundamental tenet of contract law that 'a contract is unenforceable if it is so indefinite and vague that the material provisions cannot be ascertained.'" *Firestone* at *12 (quoting *Ewing*, 486 N.E.2d at 1098).

Tesler argues that, although the terms may seem vague to those not in the financial services industry, they are standard financial services terms that the parties both understood given their

experience in the industry. (Filing No. 93 at 16-17.) He designates two key pieces of evidence to support this argument. First, during his deposition, when asked if, based on his experience in the financial industry, he would know what 25, 10, 5, 3 meant, he answered "Yes. Personally, with over 20 years' experience and my experience within the, you know, asset management sales field, I would understand that's what that meant." (Filing No. 93-2 at 5.) That still leaves the issue of the term ongoing, which is ambiguous and is not a term of art in the financial industry.

And it seems unreasonable that an employer would offer to pay an employee a commission for the life of an investment account that would continue after the employer terminated his employment. Even Tesler testified that, in his over 20 years of experience in the industry, he does not recall ever being aware of someone who received commission payments after being terminated. (Filing No. 85-2 at 15.) But Tesler identifies one fact that would support the existence of this seemingly unreasonable compensation scheme—he testified that Cannon-Gordon explicitly told him he would receive commission on accounts he generated even after his employment with Miller/Howard had ended. (Filing No. 85-3 at 3.) Miller/Howard argues Cannon-Gordon was not its employee nor was she an agent empowered to negotiate employment terms with Tesler. (Filing No. 85 at 3.) But Cannon-Gordon was at least engaged by Miller/Howard to discuss with Tesler the terms of his employment should he choose to accept a job at Miller/Howard. Factual questions remain as to whether Tesler was justified in considering Cannon-Gordon an agent of Miller/Howard and whether the company would be held to any representations she made when discussing potential employment with Tesler. Given this evidence, it is possible a reasonable factfinder could determine that the Miller/Howard agreed to pay Tesler an ongoing 3% commission on accounts he generated even after the termination of his employment and that the Terms of Compensation affirmed that agreement.

## 2. Receipt and Acknowledgment of Employee Policies

The Receipt and Acknowledgment Form, which bears Tesler's signature, makes clear that Employee Policies "are not to be construed as a contract between the Company and any of its employees." ([Filing No. 85-1 at 57](#).) Further, the document specifies that Miller/Howard can "change, rescind, or add to any procedures, benefits or practices described in the policies from time to time in its sole and absolute discretion." *Id.* Nevertheless, Tesler argues the Employee Policies are the partial basis for his employment contract with Miller/Howard.

The Receipt and Acknowledgment Form makes clear on its face that the Employee Policies on their own do not form the basis of a contract. Indeed, the document's only stated purpose is to ensure that Tesler received the Employee Policies and to make him aware that they are not a contract and that Miller/Howard can change them at its discretion. Furthermore, the Employee Policies document itself says, at the very beginning, that "[t]his is not a contract between [Miller/Howard] and its employee but is provided for information only and may be modified from time to time." *Id.* at 16.

The "Terms of Compensation" document defines as a term of Tesler's compensation to be "[b]enefits as outlined in [Miller/Howard's] Employee policies." But this incorporation by reference into what may be a contract is not enough to create a contract out of the Employee Policies, which not only insists that it is not a contract but also that it can be modified at any time by Miller/Howard. ([Filing No. 85-1 at 16](#).) An agreement to provide benefits as outlined in the Employee Policies is no agreement at all, since Miller/Howard could modify the Employee

Policies at any time at its sole discretion. But this provision of the Terms of Compensation, which deals with benefits, is severable from the rest of the document, which deals with pay.[1]

Miller/Howard also claims that Tesler's breach of contract claim is barred by Indiana's two-year statute of limitation on "[a]n action relating to the terms, conditions, and privileges of employment except actions based upon a written contract." Ind. Code § 34-11-2-1. But having already determined that a reasonable factfinder could determine an enforceable written contract exists between the two parties, Tesler's claim properly falls under Indiana Code § 34-11-2-9, which bars claims based on "promissory notes, bills of exchange, or other written contracts for the payment of money" only if they are commenced more than six years after the cause of action accrues. Tesler's breach of contract claim is not barred by the statute of limitation.

Because it is possible that a reasonable factfinder could determine the two parties formed a written contract and that the contract requires Miller/Howard to pay Tesler a 3% commission on accounts he generated there for the lifetime of those accounts, the Court **denies** summary judgment on Tesler's breach of contract claim.

B.  **Unjust Enrichment (Count III), Negligence (Count V), and Breach of Fiduciary Duty (Count VIII)**

Miller/Howard argues summary judgment is warranted on Tesler's unjust enrichment claim, his negligence claim, and his breach of fiduciary duty claim for two reasons. First, the claims are barred by Indiana's two-year statute of limitation for employment-related claims codified at Indiana Code § 34-11-2-1. And second, Tesler may not pursue his claims under theories

---

[1] Tesler's assertion in his deposition testimony that the Confidentiality Agreement (Filing No. 85-1 at 54-55) forms a contract between the two parties is irrelevant, as his Second Amended Complaint does not allege that Miller/Howard breached that contract.

of unjust enrichment, negligence, or breach of fiduciary duty because his commissions are "wages" under the Indiana Wage Claims Statute and thus his sole remedy is provided by that statute.[2]

### 1. **Statutes of Limitation**

Under Indiana law, "an action relating to the terms, conditions, and privileges of employment except actions based upon a written contract (including, but not limited to, hiring or the failure to hire, suspension, discharge, discipline, promotion, demotion, retirement, wages, or salary) must be brought within two (2) years of the date of the act or omission complained of." Ind. Code § 34-11-2-1; *see Peake v. Int'l Harvester Co.*, 489 N.E.2d 102, 105-06 (Ind. Ct. App. 1986) (concluding that unjust enrichment claims based on unpaid wages were subject to the two-year statute of limitation because "substance prevails over form"); *see also Knutson v. UGS*, 2007 WL 2122192, at *17 (S.D. Ind. 2007) (concluding that plaintiff's unjust enrichment claim was subject to a two-year statute of limitation under Indiana Code § 34-11-2-1); *Veerkamp v. U.S. Security Associates*, 2006 WL 2850020, at *20 (S.D. Ind. 2006) (applying a two-year statute of limitation to plaintiff's claims for wages under different theories because they all related to "the terms, conditions, and privileges of employment"). Tesler does not dispute that a two-year statute of limitation applies to his claims for negligence and breach of fiduciary duty but argues his unjust enrichment claim is governed by a six-year statute of limitation, citing *City of East Chicago, Indiana v. East Chicago Second Century, Inc.*, 908 N.E.2d 611 (Ind. 2009). But *City of East Chicago* is not an employment case, nor is *Bucher and Christian Consulting, Inc. v. Novitex Enter. Solutions, Inc.*, 2015 WL 5210688 (S.D. Ind. May 22, 2015), a case from our Court citing it for Indiana's six-year statute of limitation on unjust enrichment claims. Indiana Code § 34-11-2-1

---

[2] Tesler brought a claim under the Indiana Wage Claim Act but the Court dismissed that claim because Tesler had failed to exhaust his administrative remedies, a requirement for relief under the Act. (Filing No. 57.)

14

governs actions related to employment, and thus these claims are governed by a two-year statute of limitation.

Tesler was terminated on March 6, 2014 and filed the original Complaint on March 21, 2016. (Filing No. 35 at 5.) Miller/Howard argues Tesler's claims accrued in early 2013 at the latest, when he began to complain to Chun that his commissions were not being properly calculated, because that is the time when Tesler would have known or should have known that his employment contract had been breached. (Filing No. 85 at 26.) Tesler argues that he would not have received his last quarterly commission payout until March 31, 2014, that is when he could have discovered the facts underlying his claims. (Filing No. 93 at 26.) He also argues that he is owed quarterly commission on the accounts that he generated even after his employment was terminated, and that a cause of action accrues anew every quarter that Miller/Howard fails to pay his commission. *Id.*

Questions of fact preclude summary judgment on the basis that Tesler's complaints are time-barred. It is not clear to the Court that Tesler's claims would accrue at the end of the last pay period in which he was employed at Miller/Howard or before that time. Tesler and Miller/Howard dispute the timing of Miller/Howard's commission payments, a factual dispute that, if resolved in Tesler's favor, would have entitled him to a commission payout at the end of March or beginning of April 2014. Because he brought these common law claims less than two years after that time, the Court cannot conclude as a matter of law that they are time-barred.

### 2. **Indiana Wage Claims Statute**

Miller/Howard argues based on *Neely v. Facility Concepts, Inc.*, 274 F. Supp. 3d 851, 859 (S.D. Ind. 2017), that Tesler was required to bring his claims under the Indiana Wage Claims Statute and only under that statute. In *Neely*, this Court dismissed a plaintiff's quantum meruit

claim against his former employer because a remedy for his claim was available under the Indiana Wage Claims Statute. "[W]here a statute prescribes a remedy, it must be pursued, and resort cannot be had in such a case to the common law remedy." *Neely* at 859 (citing *Carnahan v. State*, 558 N.E.2d 845, 848 (Ind. Ct. App. 1990)). *See Monon R. Co. v. Citizens of Sherwood Forest Addition, Marion Cty.*, 247 N.E.2d 846, 849-50 (Ind. Ct. App. 1970) (explaining that if a "statute provides for a procedure for such review or for a judicial remedy, it excludes any common law or equitable procedure to the extent such statutory provisions are adequate in protecting an preserving such substantive rights guaranteed by the constitution, the statutes or general principles of law…. Where the legislature creates a right and prescribes the method whereby the right may be enforced['] the statutory remedy so provided is exclusive.") (citations omitted).

Tesler attempts to distinguish his case from *Neely*, arguing that "*Neely* applies only to regular unpaid wages and not commissions." But that distinction is immaterial because the Indiana Wage Claims Act treats unpaid commission the same as unpaid wages. Ind. Code § 22-2-9-1(b) ("The term 'wages' means all amounts at which the labor or service rendered it recompensed, whether the amount is fixed or ascertained on a time, task, piece, or *commission basis*, or in any other method of calculating such amount." (Emphasis added.)). The Indiana Wage Claims Act provides a remedy for Tesler's claims for unjust enrichment, negligence, and breach of fiduciary duty. He cannot circumvent the Indiana Wage Claim Act by bringing his claims under theories of common law. Thus, Miller/Howard's Motion for Summary Judgment as to Counts III, V, and VI of Tesler's complaint is **granted**.

IV. CONCLUSION

For the foregoing reasons, Miller/Howard's Motion for Summary Judgment ([Filing No. 84](#)) is **GRANTED in part and DENIED in part**. Summary judgment is **granted** on Tesler's

claims for unjust enrichment (Count III), negligence (Count V), and breach of fiduciary duty (Count VI), and these claims are **DISMISSED**. Summary Judgment is **denied** on Tesler's breach of contract claim (Count VIII), which claim may proceed to trial.

**SO ORDERED.**

Date: 2/4/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael A. Clements
CLEMENTS LEGAL GROUP LLC
MAC@CScounsel.com

Michael H. Michmerhuizen
BARRETT & MCNAGNY LLP
mhm@barrettlaw.com

Michael W. Padgett
JACKSON LEWIS PC (Indianapolis)
padgettm@jacksonlewis.com

Melissa K. Taft
JACKSON LEWIS PC (Indianapolis)
melissa.taft@jacksonlewis.com